RECORD NUMBER: 13-4257(L)

# United States Court of Appeals

## *for the*

# Fourth Circuit

**UNITED STATES OF AMERICA,**

*Appellee,*

– v. –

**ALFANCO DEXTER BRITTON,**
**ANTONIO DEMETRIUS WILLIAMS,**
**NIKKI KATHLEEN WILLIAMS, and**
**DEMARIO DERMINE COFFIE,**

*Appellants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA AT HARRISONBURG**

## OPENING BRIEF OF APPELLANTS

**JOHN S. HART, JR.**
HART LAW OFFICES, SUITE A
**84 West Water Street**
**Harrisonburg, VA 22801**
**(540) 574-0366**
*Counsel for Nikki Williams*

**WYNN ANDREW HARDING**
W. ANDREW HARDING, PLC
**57 South Main Street, Suite 603**
**Harrisonburg, VA 22801**
**(540) 432-6500**
*Counsel for Alfanco Britton*

**ROLAND SANTOS**
LAW OFFICE OF ROLAND SANTOS
**52 E. Market Street**
**Harrisonburg, VA 22801**
**(540) 434-2211**
*Counsel for Demario Coffie*

**AARON LEE COOK**
COOK ATTORNEYS,
    A PROFESSIONAL CORPORATION
**71 Court Square, Suite B**
**Harrisonburg, VA 22801**
*(540) 564-9699*
*Counsel for Antonio Williams*

CP  COUNSEL PRESS • VA – (800) 275-0668

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT OF JURISDICTION.............................................................. 1

STATEMENT OF THE ISSUES.................................................................. 1

STATEMENT OF RELATED APPEALS ..................................................... 2

STATEMENT OF THE CASE...................................................................... 2

STATEMENT OF THE FACTS ................................................................... 2

SUMMARY OF THE ARGUMENT ........................................................... 11

ARGUMENTS AND CITATION OF AUTHORITIES ............................. 12

I.    THE TRIAL COURT ERRED IN ITS SENTENCING OF
      ANTONIO WILLIAMS AND ALFANCO BRITTON IN
      FINDING THAT THE MANDATORY LIFE SENTENCE IN 21
      U.S.C. § 841(b)(1)(A) DOES NOT VIOLATE THE EIGHTH
      AND FIFTH AMENDMENTS TO THE U.S. CONSTITUTION .... 12

      A. Standard of Review ................................................................ 12

      B. Discussion of the Issue ........................................................... 12

II.   THE TRIAL COURT PLAINLY ERRED IN ITS SENTENCING
      OF ANTONIO WILLIAMS AND ALFANCO BRITTON IN
      FAILING TO SUBMIT TO THE JURY THE ISSUE OF
      WHETHER THEY HAD PREVIOUSLY BEEN CONVICTED
      OF FELONY DRUG OFFENSES WHICH INCREASED
      MANDATORY  MINIMUM PENALTIES IN VIOLATION OF
      THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION ....... 18

      A. Standard of Review ................................................................ 18

      B. Discussion of the Issue ........................................................... 18

i

III.   THE TRIAL COURT ERRED IN ITS SENTENCING OF ALFANCO BRITTON IN RULING THAT PRIOR DRUG CONVICTIONS WERE NOT OBTAINED IN VIOLATION OF THE U.S. CONSTITUTION MANDATING A MANTATORY LIFE SENTENCE PURSUANT TO 21 U.S.C. § 841(a)(1)(A) WHEN APPELLANT WAS NOT ADVISED OF THE CONSEQUENCES OF HIS PLEAS IN THE PRIOR STATE PROCEEDING IN A MANNER THAT HE WOULD UNDERSTAND ................................................................ 20

        A. Standard of Review .................................................. 20

        B. Discussion of the Issue ........................................... 21

IV.   THE TRIAL COURT ERRED IN NOT GRANTING A MISTRIAL AS TO ALL APPELLANTS WHEN IT WAS REVEALED MIDTRIAL THAT LAW ENFORCEMENT WOULD EXPOSE SEQUESTERED WITNESSES TO THE INTERIOR OF THE COURTROOM, NOTABLY INCLUDING THE SEATING OF THE DEFENDANTS, PRIOR TO THEIR TESTIMONY ........................................................... 25

        A. Standard of Review .................................................. 25

        B. Discussion of the Issue ........................................... 25

V.    THE TRIAL COURT PLAINLY ERRED AT SENTENCING IN APPLYINGA THREE-LEVEL SENTENCING ENHANCEMENT UNDER U.S.S.G. § 3B1.1(b) AS TO APPELLANT NIKKI WILLIAMS FOR HER ALLEGED ROLE IN THE OFFENSE AS A MANAGER OR SUPERVISOR ............ 32

        A. Standard of Review .................................................. 32

        B. Discussion of the Issue ........................................... 25

CONCLUSION ............................................................. 36

REQUEST FOR ORAL ARGUMENT ....................................... 36

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Alleyne v. U.S.,
    No. 11-9335, 2013 BL 158522 (U.S. June 17, 2013)............. 18, 19, 20

Apprendi v. New Jersey,
    530 U.S. 466 (2000)........................................................................ 18

Boykin v. Alabama,
    395 U.S. 295 U.S. 238 (1969) ..................................................... 21, 22

Ellerby v. U.S.,
    187 F.3d 257 (2d Cir. 1998) ............................................................ 34

Ewing v. California,
    538 U.S. 11 (2003)........................................................................... 13

Goodwin v. State,
    598 So.2d 295 (Fla. Dist Ct. App. 1st Dist. 1992) ............................ 22

Graham v. Florida,
    560 U.S. ____, 130 S. Ct. 2011 (2010) ..................... 12, 14, 15, 16, 17

Griffith v. Kentucky,
    479 U.S. 314 (1987)......................................................................... 19

Harmelin v. Michigan,
    501 U.S. 957 (1991)..................................................................... 13, 14

Harris v. U.S.,
    536 U.S. 545 (2002)..................................................................... 18, 20

Hutto v. Davis,
    454 U.S. 370 (1982)......................................................................... 13

Marshall v. Lonberger,
    459 U.S. 422 (1983).......................................................................... 20

McCarthy v. U.S.,
    394 U.S. 459 (1969)........................................................................ 21

Miller v. Alabama,
    567 U.S. ___, 132 S. Ct. 2455 (2012) ..................................... 12, 16, 17

North Carolina v. Alford,
    400 U.S. 25 (1970)........................................................................ 21

Parke v. Raley,
    506 U.S. 20 (1992)........................................................................ 22

Robinson v. California,
    370 U.S. 660 (1962)........................................................................ 17

Roper v. Simmons,
    543 U.S. 551 (2005)........................................................................ 15

Smith v. Paderick,
    519 F.2d 70 (4th Cir. 1975) ........................................................ 26

Solem v. Helm,
    463 U.S. 277  (1983)........................................................ 12, 14, 17

Teague v. Lane,
    489 U.S. 288 (1989)........................................................................ 20

U.S. v. Archibald,
    734 F. 2d 938 (2nd Cir. 1984)........................................................ 27, 30

U.S. v. Burgos,
    94 F.3d 849 (4th Cir. 1996) ........................................................ 23, 29

U.S. v. Carter,
    601 F. 3d 252 (4th Cir. 2010) ........................................................ 32

U.S. v. Cropp,
    127 F.3d 354 (4th Cir. 1997) ........................................................ 25

U.S. v. D'Anjou,
    16 F.3d 604 (4th Cir. 1994) ........................................................ 16

v

U.S. v. Greene,
   704 F.3d 298 (4th Cir. 2013). ....................................................... 26, 30

U.S. v. Harvey,
   532 F. 3d 326 (4th Cir. 2008) ........................................................ 32

U.S. v. Johnson,
   587 F.3d 625 (4th Cir. 2009) ......................................................... 25

U.S. v. Kellam,
   568 F. 3d 125 (4th Cir. 2009) ........................................................ 32

U.S. v. Kratsas,
   45 F.3d 63 (4th Cir. 1995) ............................................................ 16

U.S. v. Mason,
   993 F.2d 406 (4th Circ 1993) ........................................................ 31

U.S. v. Moreland,
   568, F.Supp.2d 674 (S.D. W. Va. 2008) ........................................ 17

U.S. v. Nyman,
   649 F.2d 208 (4th Cir. 1980) ........................................................ 31

U.S. v. Penniegraft,
   641 F.3d 566 (4th Cir. 2011) ........................................................ 18

U.S. v. Rogers,
   126 F.3d 655 (5th Cir. 1997) ..................................................... 26, 30

U.S. v. Slade,
   631 F.3d 185 (4th Cir. 2011) ........................................................ 34

U.S. v. Walker,
   160 F.2d 1078 (6th Cir. 1998) ...................................................... 20

U.S. v. Ward,
   518 F.2d 75 (1st Cir. 2008) ...................................................... 20, 24

Weems v. U.S.,
   217 U.S. 349 (1910) .................................................................... 13

## RULES, STATUTES, AND OTHER AUTHORITIES

18 U.S.C. § 3553(a) ......................................................... 14, 17

18 U.S.C. § 3742(a) ............................................................. 1

21 U.S.C. § 841(a)(1)(A) ................................................ *passim*

21 U.S.C. § 846. ................................................................ 6

21 U.S.C. § 851 ............................................................ *passim*

21 U.S.C. § 851(c)(2) ......................................................... 20

28 U.S.C. § 1291 ................................................................ 1

28 U.S.C. § 2254 ............................................................... 21

28 U.S.C. § 2255 ............................................................... 21

Fed .R. Cr. P. 11 .............................................................. 24

Fed R. Evid. 615 .............................................................. 25

Fed. R. App. P. 3 ............................................................... 1

Fed. R. App. P. 4 ............................................................... 1

Fla. R. Crim. P. 3.170(a) ................................................... 22

Fla. R. Crim. P. 3.170(k) ................................................... 22

Florida Jur.2d, Criminal Law § 1327 ................................ 22

U.S. Constitution, Fifth Amendment ............................... 12

U.S. Constitution, Sixth Amendment ........................... 1, 18

U.S. Constitution, Eighth Amendment ........................ *passim*

U.S. Constitution, Fourteenth Amendment ..................... 26

U.S.S.G. Section 3B1.1(b) .......................................... 2, 32

*Deconstructing the Career Offender Guideline* by Amy Baron-Evans, et al., April 1, 2011 ........................................................................ 17

## STATEMENT OF THE CASE

The Grand Jury of the U.S. District Court for the Western District of Virginia sitting in Harrisonburg indicted the parties in April, 2012. (JA I:81-90).[1] The matter was joined for trial and heard before a jury from October 22, 2012 to November 1, 2012. The Defendants were all found guilty of conspiracy to distribute crack cocaine with three of the four being found guilty of a number of distribution charges. (JA VI:2294-2302). All were sentenced in April, 2013 and timely appeals were filed from all final orders. (VI:2372, 2392, VII:2525, 2532, 2538, 2545, 2546, 2547).

## STATEMENT OF FACTS

The government's theory of the case is that the parties engaged in an extensive crack cocaine conspiracy in the Winchester, Virginia area between 2010 and 2012. Evidence was presented of a number of controlled purchases of crack from several of the defendants. While police identified several of the defendants, it was notably from a distance and assisted by identification by the confidential informants and other lay witnesses. (JA II:402-3, III:876-881). Notably, the Drug Task Force used a book of pictures which featured several of the Defendants prominently. (JA III:948, IV:1347).

---

[1]    All references to the Joint Appendix will refer to the Volume by Roman numeral, page number and, if necessary, a line number. So (JA V:1811.13) would be Volume V, page 1811, line 13.

Trial began on Monday, October 22, 2012. After law enforcement and forensic witnesses testified, a number of lay witnesses -predominantly codefendants and confidential informants- began testifying on October 25. By the morning of Tuesday, October 30, 17 of these witnesses had testified.[2] On the morning of the 30th, one defense counsel advised the Court that he had observed an investigator taking a person to the window in the rear of the courtroom "pointing in the window and the lady shaking her head up and down and also back and forth, pointing in my direction and the direction of this table." (JA V:1782). Other defense counsel advised that their clients had noted similar behavior through the trial but had never observed it themselves. (JA V:1782-3, 1801.20, 1806.3, 1811.13).

The court called Det. Bielecki, the investigator who was seen through the window. He stated that he had brought witnesses to the back window of the courtroom to see the layout. Notably he pointed out where the Defendants were seated along with other positions such as the jury and witness seat. He denied pointing out, identifying, or naming any defendants. (JA V:1786). He was also

---

[2]    Referring the beginning of each of their testimony on the record, they were: Russell Milburn (JA III:885), Keith Lambert (JA III:957), Tonya Lackovich (JA III:997), Chris Simmons (JA III:1097), David Weatherholtz (JA III:1127), Jackie Chambers (JA III:1148), Grendel Rector (JA III:1170), Kevin Freeman (JA IV:1188), Jason Guadine (JA IV:1267), David Shifflett (JA IV:1347), Kathy Wheeling (JA IV:1471), Steve Bourland (JA IV:1598), Tina Kritzer (JA V:1628),

asked whether he asked any questions of the witnesses that would require a yes or no such as whether she recognized any one. Bielecki denied doing so. (JA V:1787).

Patricia Miller advised that she was in fact asked whether she recognized anyone. (JA V:1793-4). She denied that Bielecki told her who the people were nor state any names. (JA V:1794). Elena Bell stated that Bielecki asked if she knew anyone in the courtroom as well. (JA V:1789-9). She also identified one person (presumably Nikki Williams) as Alfanco Britton's wife. (JA V:1798). She denied that any others were identified. (JA V:1798-9). Bell also stated that the defense table was pointed out. (JA V:1800).

Counsel for Coffee sought a mistrial, joined by others. The Court quite emphatically denied the motion, noting "… the Court does not believe in my heart of hearts, based on what I heard from this witness stand, that anything improper happened and there was any suggestion of any witnesses." (JA V:1825.13-21, see also 1803.10, 1820-1, 1823.16). However, in the height of caution, it excluded testimony from Bell and Miller. After this, only one other lay witness was called to the stand and one other was recalled.[3]

_____

Kevin Kerns (JA V:1672), Sycarra Chinn (JA V:1708), Andrea Tipton (JA V:1743), and Tina Warner (JA V:1753).

[3]    Kevin Freeman was recalled. (JA V:1872). Michael Jones was the only new witness (JA V:1946).

The Defendants were all found guilty of conspiracy to distribute crack cocaine with three of the four being found guilty of a number of distribution charges.

Prior to trial the government filed notices of prior convictions pursuant to 21 U.S.C. § 851 as to Antonio Williams and Alfanco Britton. Based upon the conspiracy conviction, both were sentenced to mandatory life imprisonment. Their verdict forms did not include special findings by the jury as to these prior offenses. Defense counsel did not raise any objection to such verdict forms. (VII: 2295 and 2299). Further details as to these Defendants are provided below.

*Facts relevant to Nikki Williams*

Ms. Williams was found guilty by a jury of count one of the Indictment, knowingly conspiring with others to distribute 280 grams or more of a mixture and substance containing cocaine base, in violation of 21 U.S.C. § 846. (JA VI:2294). At sentencing, there was a defense objection to the offense level adjustment for role in the offense and the estimated drug weight for the base offense level. (JA VII:2597-2500). Despite minimal evidence of any management or supervisory role, the trial court upheld the role enhancement and sentenced the Appellant Nikki Williams to 210 months imprisonment. The trial court disregarded the trial testimony of Jason Guadine and David Shifflett who both testified Ms. Williams was rarely seen and minimally involved. (JA IV:1295-

6

1296, 1402-1403). Neither Kevin Kerns nor Sycarra Chin knew the Appellant. (JA V:1675-1676, 1714). The testimony of Special Agent John Brian Padgett was also not persuasive concerning the money and wire transfers from Winchester to Florida. (JA V:1897-1945, VI:2150-2177) No direct proof was offered that the Appellant, Nikki Williams, was ever involved in any money transfers related to the conspiracy. (Jt. Appendix Vol. 5, pgs. 1916-1917).

*Facts relevant to Alfanco Britton*

Alfanco Britton has severe limitations on what he can read and understand. At sentencing, Britton testified that that before he dropped out of school, he was in special education with a one-on-one tutor. (JAVII:2417-2427). See the undisputed summary of Britton's reading and educational level (JA VIII:2549 ¶ 73) and the educational report attached to the PSR, especially Britton's reading level. (JA VIII:2572). Separate from the documented educational difficulties of Britton, he testified that he failed the Florida Motor Vehicle Written Test four times before passage.

On May 23, 2012, the government provided notice pursuant to 21 U.S.C. § 851 that it intended to seek an enhancement of sentence based upon prior convictions of Britton. (JA I:102). These convictions will be referred to below as 2007 Conviction and 2008 Convictions and the Palm Beach Circuit Court will be

7

the State Court. The 2008 Convictions were part of the same proceeding so the facts will be the same.

While in U.S. District Court and the Virginia state courts, defendants who plead guilty are orally advised of the myriad rights that they are giving up, this was not done in either State Court proceedings with one limited exception in the 2008 Convictions. Instead, Britton signed a ""Plea in the Circuit Court" form with this information and then in the oral colloquy, Britton was asked whether he read and understood the form that he had signed. In both cases Britton acknowledged that he did.

Both proceedings were recorded and the District Court reviewed them prior to sentencing. The following is a summary of the records contained in the Record (JA VII:2405-2408):

2007 Conviction. Total time: 1 minute, 29 seconds.

Britton was sworn and asked he had "read and understood" the form that he had just signed. Britton answered yes. Britton was asked whether he was under the influence. Britton answered no. Britton was asked if he was threatened. Britton answered yes. The Court repeated the question. Britton answered no. The Court orally stated that he was convicted of the charge and sentenced to 60 days with credit for time served. Before Britton could answer yes, the Court called the name of the next case.

8

Britton was never asked what his reading level was nor did the court make any finding about his knowledge of the consequences.

<u>2008 Convictions</u>. Total time: 10 minutes, 11 seconds.

Britton was sworn and asked his name and date of birth. The Court recited several charges against him and maximum penalties. Britton was asked whether he could "read and understand English fluently." Britton answered yes. Britton was asked if he was under the influence or suffered from mental illness Britton answered no. The Court briefly discussed the outline of the plea, what charges would be dropped and what he was pleading guilty.

The Court held up a form and asked Britton if he signed the Plea Agreement. Britton answered yes. The Court asked if he signed the "list of rights such as trial by jury." Britton answered yes. Britton was asked if he signed and understood the form. Britton answered yes. Nothing further was stated about the content of the "list of rights" form.

Britton was asked if he had enough time to discuss the matter and if he was satisfied with his counsel. After acknowledging in the affirmative, the Court advised Britton that he should be because it was a good deal with the number of charges. Amidst a review of the original charging documents, Britton appeared to be rocking back and forth. Over polite objection of the State's Attorney, the Court called a recess for Britton to relieve himself.

Upon return, the Court asked Britton if he understood what was going on. Britton answered yes. The Court found that Britton had freely and voluntarily given his plea and understood the nature and consequences of his plea. Britton was adjudicated guilty.

After argument at the District Court, the Court found a knowing and voluntary waiver of constitutional rights and that the Florida convictions were not in violation of Britton's constitutional rights. (JA VII:2434). Based on this ruling the Court was bound to sentence Britton to mandatory life imprisonment. He was 28 years old at the time of the offense.

*Facts Relevant to Antonio Williams*

Prior to trial the government filed notices of prior convictions pursuant to 21 U.S.C. § 851. (JA I:91). These prior convictions were two possession charges from the State of Florida. In the sentencing proceeding, the District Court judge repeatedly expressed that he was troubled by the length of the required sentence in this case. (JA VI:2330, 2334-5, 2337, 2348, 2364).  The Court stated:

> The thing that cries out to me about this case is the fact that the amount of time Antonio Williams got on those Florida possession of cocaine charges…He served less than a month on each one and all of a sudden, we're ramped up to mandatory life, without possibility of release.  That's what makes me shake my head.  That's what keeps me up at night thinking about this stuff.  That's what caused me to read all these Supreme Court cases and Fourth Circuit cases on this subject because if you think about proportionality and you just compare, first conviction in Florida, 28 days; second conviction in Florida, 19 days;

10

third conviction, federal court in Virginia, mandatory life, there's a disconnect. Holy cow. Doesn't seem right, okay? (JA VI:2330-1).

Based upon the conspiracy conviction, Williams were sentenced to mandatory life imprisonment. He was 20 years old at the time of the offense.

## SUMMARY OF ARGUMENT

For Antonio Williams and Alfanco Britton, the trial court had no discretion in sentencing them to life imprisonment based upon the enhancement under 21 U.S.C. § 851. In light of recent U.S. Supreme Court decisions, the mandatory nature of sentencing violated proportionality of punishment under the Eighth Amendment. Further, a minimum mandatory sentence based upon findings by the Court and not the Jury, violated the Sixth Amendment.

The Court should have granted a mistrial based upon a pattern of showing witnesses the interior of the Courtroom while the trial proceeded. While the Court excluded the two witnesses observed directly, it did nothing to resolve the suggestive nature for the 17 lay witnesses who had testified at that point in the trial. The in court identification was tainted and requires a new trial.

Nikki Williams was never charged nor convicted of a controlled purchase of narcotics. The only connections to the conspiracy, and any leadership role, were witnesses whose credibility and recollection was severely questioned at trial. The enhancement at sentencing for a leadership role in this conspiracy is contrary to the evidence.

11

<u>**ARGUMENTS AND CITATION OF AUTHORITY**</u>

**I.    THE TRIAL COURT ERRED IN ITS SENTENCING OF ANTONIO WILLIAMS AND ALFANCO BRITTON IN FINDING THAT THE MANDATORY LIFE SENTENCE IN 21 U.S.C. § 841(b)(1)(A) DOES NOT VIOLATE THE EIGHTH AND FIFTH AMENDMENTS TO THE U.S. CONSTITUTION**

**A.    Standard of Review**

This is matter of law which is subject to de novo review.

**B.    Discussion of the Issue**

In the case of Appellant Antonio Williams and Alfanco Britton, the mandatory sentence of life required by 21 U.S.C. § 841(b)(1)(A) is unconstitutional, in violation of the Eighth Amendment and the Due Process Clause of the Fifth Amendment.

The Eighth Amendment of the United States Constitution prohibits the infliction of cruel and unusual punishments. For many years, Eighth Amendment jurisprudence has focused most of its attention on death penalty cases, developing a robust proportionality review in capital cases.[4]   Regarding cases that do not involve the death penalty, it is often cited that "outside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [will be] exceedingly rare." <u>Solem v. Helm</u>, 463 U.S. 277, 289-90 (1983)

---

[4] In doing so, the Supreme Court has taken the view that 'death is different.' However, in *Miller v. Alabama, ante,* and *Graham v. Florida, ante,* the Court extends that rationale to include 'death in prison.'

12

(emphasis in original)(citations omitted). Federal courts should be "reluctant to review legislatively mandated terms of imprisonment." <u>Hutto v. Davis</u>, 454 U.S. 370, 374 (1982) (citations omitted).

Yet the Supreme Court for many years has recognized a narrow proportionality principle that applies to noncapital sentences, protecting a criminal defendant from the imposition of a punishment that is "grossly disproportionate" to the offense. See <u>Ewing v. California</u>, 538 U.S. 11 (2003); <u>Harmelin v. Michigan</u>, 501 U.S. 957 (1991).

Certainly the moral foundation for proportional sentencing goes back many centuries, long before English common law and the United States Constitution. The Framers intended the Eighth Amendment to reflect the notion that "it is a precept of justice that punishment for crime should be graduated and proportioned to [the] offense." <u>Weems v. United States</u>, 217 U.S. 349, 367 (1910).

The mandatory sentence of death-in-prison also violates the Due Process Clause because it prevents the District Court from conducting individualized sentencing, and it violates the doctrine of separation of powers because it turns the judicial function of determining the sentence entirely over to the executive branch.

Proportional sentencing is embedded in the current statutory sentencing scheme, requiring the District Court to "impose a sentence sufficient, but not

greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).

But the District Court could not follow that mandate in this case, where the only available sentencing option – life imprisonment – was a grossly disproportionate and unjust sentence.

Proportionality review is especially necessary to ensure justice in the face of recent dramatic increases in the number of and length of mandatory minimum sentences.  And proportionality review is necessary because a death-in-prison sentence in this case is contrary to the evolving standards of decency that are the hallmark of our civilized society.

The Supreme Court in Solem, *supra*, laid out a clear framework for proportionality review.  Then, in Harmelin, *supra*, the Court backed away from Solem and seemed to mostly overrule proportionality review except it very limited circumstances.  But more recently, the Supreme Court has resurrected Solem, invalidating the imposition of a life sentence in one case and striking down the mandatory nature of the sentence in another.

In Graham v. Florida, 560 U.S. ____, 130 S. Ct. 2011 (2010), the Court held that the Eighth Amendment does not permit a young offender to be sentenced to life in prison without parole for a nonhomicide crime.

> The Court has recognized that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers … Serious nonhomicide crimes may be devastating in their harm but in terms of moral depravity and of the injury to the person and to the public, they cannot be compared to murder in their severity and irrevocability… This is because life is over for the victim of the murderer, but for the victim of even a very serious non homicide crime, life is not over and normally is not beyond repair.  Although an offense like robbery or rape is a serious crime deserving serious punishment, those crimes differ from homicide crimes in a moral sense.

Id. at ___, 2027, 842 (citations omitted).  This is even truer of non-violent drug offenses.

In Graham the Supreme Court said that, in addition to "the nature of the crime," the age of the offender also bears on the analysis.  Id.  Citing Roper v. Simmons, 543 U.S. 551 (2005), and other cases along with our current understanding of the developing human, Graham held that sentencing a young and not-yet-matured young man to life in prison without parole for a nonhomicide offense violates the Eighth Amendment.  The defendant in Graham was under the age of 18, an arbitrary age of majority in our society; Graham did not address whether its holding applies to a 19 or 20 year old defendant who is also not-yet-matured like Williams, nor those like Britton with functional limitations.  It would be unreasonable to believe that sentencing the 17-year-and-360-day-old defendant to life in prison without parole violates the Eighth Amendment while his co-

15

defendant who is one week older can constitutionally receive a sentence of death-in-prison.

The Court has already extended Graham beyond its initially-apparent terms, holding last year in Miller v. Alabama, 567 U.S. ___, 132 S. Ct. 2455 (2012), that its rationale also applies to mandatory life sentences in homicide cases for juveniles. In Miller the Court held that while a young homicide defendant may be given a death-in-prison sentence, it cannot be a mandatory sentence.

> Most fundamentally, Graham insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole… [T]he characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate… An offender's age, we made clear in Graham, is relevant to the Eighth Amendment, and so criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed… But the mandatory penalty schemes at issue here prevent the sentence from taking account of these central considerations.

Id. at ___, 2465-2466 (citations omitted).

It is true that this Court has upheld recidivist statutes, including 21 U.S.C. § 841(b)(1)(A), in the face of Eighth Amendment challenges. See United States v. Kratsas, 45 F.3d 63 (4th Cir. 1995); United States v. D'Anjou, 16 F.3d 604 (4th Cir. 1994). However, the time has come to reconsider those prior holdings. As the Supreme Court has said:

> In sum, we hold as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted. Reviewing courts, of course, should grant substantial

16

> deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals.  But no penalty is per se constitutional.  As the Court noted in <u>Robinson v. California</u>, 370 U.S. 660, 667 (1962), a single day in prison may be unconstitutional in some circumstances.

<u>Solem</u>, at 290.  The legislature cannot foreclose the judicial function merely by inserting the word "mandatory" into the statute.

In the case of Antonio Williams, like the defendants in <u>Graham</u> and <u>Miller</u>, where a very young and not-yet-matured individual is facing a sentence of life without the possibility of release, the Eighth Amendment must require individualized consideration so that the punishment is not disproportionate to the crime. In addition to the Appellant's age, it is important to understand that Antonio's prior convictions which form the basis of the enhancement are two *simple possession* (not distribution) charges.[5]

For the foregoing reasons, we respectfully request that the Court find that the mandatory life provision in 21 U.S.C. § 841(b)(1)(A) is unconstitutional  and that

---

[5] Much has been written about the problems of disproportionality with the Career Offender enhancement in the Federal Sentencing Guidelines.  See, for example, *Deconstructing the Career Offender Guideline* by Amy Baron-Evans, et al., April 1, 2011, which can be found at http://www.fd.org/odstb_SentDECON.htm. And see, for example, <u>United States v. Moreland</u>, 568, F.Supp.2d 674 (S.D. W. Va. 2008).  But even the often-disproportionate Career Offender enhancement – which is not mandatory – requires the prior felony controlled substance offenses to be distribution offenses.  It is unconscionable that a 20-year-old offender must receive a mandatory life sentence for drug distribution under a "three strikes" provision where the first two strikes were simple possession charges.

17

the Court remand the case of Antonio Williams and Alfanco Britton to the District

Court for sentencing pursuant to 18 U.S.C. § 3553(a).

## II.   THE TRIAL COURT PLAINLY ERRED IN ITS SENTENCING OF ANTONIO WILLIAMS AND ALFANCO BRITTON IN FAILING TO SUBMIT TO THE JURY THE ISSUE OF WHETHER THEY HAD PREVIOUSLY BEEN CONVICTED OF FELONY DRUG OFFENSES WHICH INCREASED MANDATORY  MINIMUM PENALTIES IN VIOLATION OF THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION

### A. Standard of Review

This matter was not raised at the trial level and hence subject to review for

plain error. Under the plain error standard, a defendant must show "(1) that the

error occurred, (2) that the error was plain, and (3) that it affected his substantial

rights." U.S. v. Penniegraft, 641 F.3d 566, 575 (4th Cir. 2011).

### B. Discussion of the Issue

The Supreme Court in Alleyne v. United States, No. 11-9335, 2013 BL

158522 (U.S. June 17, 2013), a case decided during the pendency of this appeal,

overruled Harris v. United States, 536 U.S. 545 (2002), and established a new rule

holding that any fact that increases the mandatory minimum sentence must be

submitted for determination by the jury.

The Alleyne holding follows a line of cases from Apprendi v. New Jersey,

530 U.S. 466 (2000), which stands for the proposition that the Sixth Amendment

18

requires that any fact which, by law, increases the penalty for a crime is an element that must be found beyond a reasonable doubt by the jury.

In the case of Appellant Antonio Williams, the District Court found as a matter of fact in sentencing that Williams had previously been convicted of two felony drug offenses and determined, therefore, that a mandatory sentence of life in prison was mandated by 21 U.S.C. § 841(b)(1)(A). (JA VI:2353-4). The question of whether Appellant Williams had been convicted of two prior felony drug offenses was not submitted to the jury which is plain error in light of the Supreme Court's ruling in Alleyne.

In the case of Appellant Alfanco Britton, the District Court found as a matter of fact in sentencing that Britton had previously been convicted of two felony drug offenses and determined, therefore, that a mandatory sentence of life in prison was mandated by 21 U.S.C. § 841(b)(1)(A). (JA VII:2445). The question of whether Appellant Britton had been convicted of two prior felony drug offenses was not submitted to the jury which is plain error in light of the Supreme Court's ruling in Alleyne.

In Griffith v. Kentucky, 479 U.S. 314 (1987), the Supreme Court held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no

exception for cases in which the new rule constitutes a 'clear break' with the past." Id. at 328.

Clearly, the rule announced in Alleyne, overruling Harris, is such a new rule. Teague v. Lane, 489 U.S. 288, 301 (1989) (defining a new rule as breaking new ground or imposing a new obligation on the government).

Because the new rule in Alleyne must be retroactively applied to cases still on direct appeal, Appellants Antonio Williams and Alfanco Britton must be given the benefit of the new rule. We respectfully request that the Court remand those cases to the District Court for resentencing in light of the District Court's plain error.

**III.  THE TRIAL COURT ERRED IN ITS SENTENCING OF ALFANCO BRITTON IN RULING THAT PRIOR DRUG CONVICTIONS WERE NOT OBTAINED IN VIOLATION OF THE U.S. CONSTITUTION MANDATING A MANTATORY LIFE SENTENCE PURSUANT TO 21 U.S.C. § 841(a)(1)(A) WHEN APPELLANT WAS NOT ADVISED OF THE CONSEQUENCES OF HIS PLEAS IN THE PRIOR STATE PROCEEDING IN A MANNER THAT HE WOULD UNDERSTAND**

**A.     Standard of Review**

The Court reviews the legal determination of the constitutionality of a prior state court proceeding under 21 U.S.C. § 851 de novo. U.S. v. Ward, 518 F.2d 75, 80 (1st Cir. 2008) (citing Marshall v. Lonberger, 459 U.S. 422, 431 (1983); U.S. v. Walker, 160 F.2d 1078, 1095-6 (6th Cir. 1998).

The standard of review for factual findings require some more detail. 21 U.S.C. § 851(c)(2) provides that Britton would have the "burden of proof by the preponderance of evidence on any issue of fact." This does not contain any deference to the findings of the State Court besides the burden of proof. Contrast with 28 U.S.C. § 2254 and § 2255. If Congress intended to defer to State Courts as it does in Habeas proceedings, it certainly knew how to do so, especially after the Antiterrorism and Effective Death Penalty Act of 1996. The fact that § 851 exists the same as it did before 1996 is telling.

**B.    Discussion of the Issue**

Alfanco Britton could not read or understand the form that he signed. The proceedings in the State Court, and hence the convictions violated Britton's constitutional rights. In the State Court, he was never orally advised of the series of rights that he was giving up and the consequences of the convictions with one exception. Instead, those advisements were contained on a form which Britton is incapable of reading. This violates the Constitution for two reasons; 1) Britton was not advised of the specific consequence the plea would have for enhancement of future penalty, and 2) Britton was not advised in a manner that he could understand of what rights he was giving up, ie. Right to jury, right to appeal, etc.

It is beyond dispute that a guilty plea must be both knowing and voluntary. See, e.g., <u>Boykin v. Alabama</u>, 395 U.S. 295 U.S. 238, 242 (1969); <u>McCarthy v. United States</u>, 394 U.S. 459, 466 (1969). "The standard was and remains whether the plea represents a voluntary and

intelligent choice among the alternative courses of action open to the defendant." <u>North Carolina v. Alford</u>, 400 U.S. 25, 31 (1970). That is so because a guilty plea constitutes a waiver of three constitutional rights: the right to a jury trial, the right to confront one's accusers, and the privilege against self-incrimination. <u>Boykin</u>, 395 U.S., at 243.

In <u>Boykin</u> the Court found reversible error when a trial judge accepted a defendant's guilty plea without creating a record affirmatively showing that the plea was knowing and voluntary. <u>Id.</u>, at 242.
<u>Parke v. Raley</u>, 506 U.S. 20, 28-29 (1992).

Like this case <u>Parke</u> enquired into the adequacy of a prior plea allocution for enhancement of punishment. But again, <u>Parke</u> was a federal habeas proceeding from a state court judgment which expressly relied upon the presumption of regularity under state law. Further, <u>Parke</u> is distinguishable because Mr. Parke sought a presumption arising from the absence of a transcript. Id. at 30. In this case we have the recording of the state proceedings which the Court can judge for itself.

Florida differs in procedure from federal and Virginia state court in not expressly requiring an oral allocution under Fla. R. Crim. P. 3.170(a). Rule 3.170(k) requires though that the Court determine "that the circumstances surrounding the plea reflect a full understanding of the significance of the plea and its voluntariness and that there is a factual basis for the plea of guilty." A treatise on state law states in part "The trial court's inquiry into whether the defendant's plea of guilty or *nolo contendere* was intelligently made <u>must not be perfunctory</u>." [citing <u>Goodwin v. State</u>, 598 So.2d 295 (Fla. Dist Ct. App. 1st Dist. 1992)] (emphasis and footnote citation added). <u>Florida Jur.</u>2d, Criminal Law § 1327.

22

Unlike <u>Boykin</u>, Britton had a sheet of paper in front of him advising of his right to a jury, right to confront witnesses, and protection against self-incrimination. But for all it mattered, it could have been in another language. Britton could not read it. In the 2007 Conviction, the Florida court failed to enquire as to Britton's reading ability. In the 2008 Conviction, it limited its inquiry as to whether Britton knew and understood English. The language enquiry (while relevant for many others in South Florida) was irrelevant for Britton. Britton understood English but the salient and unanswered question was how much English Britton could read.

The 2007 Conviction failed to make a finding of knowledge on the part of Britton of the rights that he was giving up. In doing so, it failed to meet even its own requirements laxer that those of other states and the U.S. Courts. The 2008 Conviction made the finding but it was still at the end of a relatively short proceeding which did not orally discuss the rights that Britton was giving up with the exception of a right to jury.

In denying the challenge, the District Court expressly found that the Florida Convictions were knowing and voluntary. "Determining credibility of witnesses and resolving conflicting testimony falls within the province of the factfinder, not the reviewing court." <u>U.S. v. Burgos</u>, 94 F.3d 849, 868 (4th Cir. 1996). This is axiomatic and understandable because the trial court could see the witnesses and

judge credibility where this court could not. But the evidence presented in this hearing was almost exclusively records (audio/video/documents) from the Florida Court which this Court can determine for itself. The only factual deference to the trial court would be the testimony of Britton himself. But the trial court made no finding about his testimony in isolation. His limits were virtually unchallenged and again the Presentence Report was not objected to by the Government.

Both the Government and the District Court are correct that the Constitution does not require the steps contained in F.R.Cr.P. 11 for acceptance of a guilty plea. This case shows why it helps. As seen, Florida has chosen to recite many of the rights waived in a written form rather than oral allocution. If a college student, or even a high school graduate were to sign such form, he or she would be hard pressed to deny a knowing and voluntary waiver. We are far from that level of knowledge and voluntary waiver. *Contra* the trial Court, in Ward, the Defendant had an 11th grade education and no extrinsic evidence was presented about reading ability. 518 F.3d. at 85-6. Britton's prior convictions are the embodiment of why the U.S. Courts and many states have oral allocution and findings on the record. Indeed, the Massachusetts court did precisely this in Ward. 518 F.3d at 77-8. The 1st Circuit also expressed misgivings about a written plea form in place of a verbal colloquy. 518 F.3d at 85, fn 16. The District Court erred in denying the challenge to the convictions.

24

Because the error, the sentencing of Britton should be remanded to the trial court for resentencing absent the predicate felonies and in accord with the requisite guidelines.

## IV. THE TRIAL COURT ERRED IN NOT GRANTING A MISTRIAL AS TO ALL APPELLANTS WHEN IT WAS REVEALED MIDTRIAL THAT LAW ENFORCEMENT WOULD EXPOSE SEQUESTERED WITNESSES TO THE INTERIOR OF THE COURTROOM, NOTABLY INCLUDING THE SEATING OF THE DEFENDANTS, PRIOR TO THEIR TESTIMONY.

### A.    Standard of Review

Whether to grant a motion for mistrial is left to the broad discretion of the trial court.  U.S. v. Johnson, 587 F.3d 625, 631 (4th Cir. 2009), cert denied, 130 S. Ct. 2128 (2010).

### B.    Discussion of the Issue

Fed R. Evid. 615 requires the sequestration of witnesses upon the request of either party. If this sequestration is violated, the Court has a number of options. The most extreme would be to exclude the testimony of the witness who was tainted by information about the pending trial. U.S. v. Cropp, 127 F.3d 354, 363 (4th Cir. 1997). In this case Elena Bell and Patricia Miller were excluded from testimony under the Court authority in this line of cases.

If the taint was restricted to Bell and Miller, the Court would have acted in its fullest authority to correct the error and the Appellants would not have a basis to ask for more. Unfortunately the taint was not restricted to them and that taint, at

day seven after more than a dozen lay witnesses, was the grave error that necessitated a mistrial in this case.

A few months ago, the Court discussed the current state of the law regarding suggestive practices as to witnesses. In <u>U.S. v. Greene</u>, the government asked a witness to a bank robbery unduly suggestive questions about the identity of the defendant. The trial court did not provide a <u>Holley-Telfaire</u> instruction (because defense counsel didn't ask) and this Court reversed. While the facts differ markedly from this case, the Court discussed the current state of the law regarding suggestive practices as to witnesses:

> The Due Process Clause of the Fourteenth Amendment protects individuals from unreliable identifications that result *306 from impermissibly suggestive procedures. We have stated, "A procedure is unnecessarily suggestive if a positive identification is likely to result from factors other than the witness's own recollection of the crime." We have also noted that the phrasing of a question may suggest a desired response. <u>Smith v. Paderick</u>, 519 F.2d 70, 75 n. 6 (4th Cir. 1975). For instance, the question, "What color tie was he wearing?" is not likely to elicit an answer of "None." Without question, we are well aware of the danger of erroneous eyewitness identifications:
> Positive identification testimony is the most dangerous evidence known to the law. That is true because it is easier to deceive ourselves than others: pressured to help solve a heinous crime, often conscious of a duty to do so, and eager to be of assistance, a potential witness may be readily receptive to subtle, even circumstantial, insinuation that the person viewed is the culprit. Unless such a witness is far more introspective than most, and something of a natural-born psychologist, he is usually totally unaware of all of the influences that result in his say, "That is the man." <u>Id</u>. at 75.
> We added, "Tainted identification evidence cannot be allowed to go to a jury because they are likely to accept it uncritically." <u>Id</u>
> <u>U.S. v. Greene</u>, 704 F.3d 298, 305-206 (4th Cir. 2013).

26

The out of Circuit cases cited in <u>Greene</u> are instructive for this situation. In <u>United States v. Rogers</u>, 126 F.3d 655, (5th Cir. 1997), the defendant objected to the recall of a government witness in the government's case in chief in order to identify the defendant in a bank robbery case; the government witnessed testified earlier but was not asked to identify the defendant.  Defendant objected to this second opportunity as impermissibly suggestive in-court identification since the defendant, the only African–American at counsel table, clearly sat next to his attorney.  The Court first determined that Defendant preserved his objection and review would be for abuse of discretion.  However, in this discussion, the Court defined plain error as error "which, when examined in the context of the entire case, is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity or public reputation of judicial proceedings." <u>Id</u> at 657.

It further noted that courts should use a two-step analysis to determine admissibility of suspect identification evidence, namely "whether the identification procedure was impermissibly suggestive and, second, whether the procedure posed a very substantial likelihood of irreparable misidentification." <u>Id. at 658.</u>  It lastly noted that "the gravamen of the determination is fairness and reliability."  <u>Id</u>. Here, the court held that the identification was both impermissibly suggestive and posed a risk of misidentification.

In <u>United States v. Archibald</u>, 734 F. 2d 938 (2nd Cir. 1984), the trial court denied the defendant's motion during trial to move him away from his counsel and replace his seat with other persons of similar race, in order to avoid improper suggestiveness for in-court identification of government witnesses. The Court of Appeals found that the trial court had committed error. It noted: "There is always the question how far in court identification is affected by the witness' observing the defendant at the counsel table." Id. at 942. However, it deemed the error harmless because photographic identification testimony alone would have supported the conviction.

In the instant matter, the trial court held a hearing outside the presence of the jury to determine any violations of the sequestration order and/or impermissible in-court identifications of the defendants by government witnesses and agents. Defense counsel told the judge that he saw a police officer pointing at the defendants with a government witness standing at the officer's side. Counsel proffered that the defendants mentioned this impropriety throughout the trial, a common complaint at trial that ordinarily holds no validity.[6] Counsels' verification through their own eyes astonished all involved, and the trial court quickly

---

[6]    The last place that a trial attorney would look in the midst of a jury trial is in the back of the Courtroom. Defense counsel should be forgiven for not wanting to interrupt the trial and ascribing actions out of the field of view when it could have been, as one attorney described, "visual trash talking." (JA V:1811.13).

questioned the officer. The officer testified that he was telling government witnesses where everyone would be placed in the courtroom during the proceedings. He testified that he never identified the defendants to the potential witnesses, either by gesture or by words. He further testified that one of the two potential witnesses in question stated that she recognized four of the defendants. He finally testified that he did not discuss any matters with the second potential witness.

The two witnesses in question subsequently testified differently at the hearing. The first witness, Patricia Miller, said that the officer asked her if she recognized anyone in the room. She replied that she did. She told him that she recognized all but one of the defendants. She said that the officer never pointed to anyone. She denied that they discussed the layout of the courtroom, as the officer stated under oath. The second witness, Elena Bell, testified that the officer asked her if she recognized anyone in the room. She said that the officer identified one defendant as the wife of another defendant (which was true). She verified that the officer pointed out that particular defendant out to her.

These witnesses cannot all be correct. This includes in no small part what defense counsel themselves saw. The trial court of course must resolve conflicting testimony. Burgos, 94 F.3d at 868. In finding that nothing "improper happened," nor that "there was any suggestion of any witness," the trial court was ruling about

29

the factual dispute between Bell, Miller, and Inv. Bieleck as to whether particular defendants were pointed out. But, even if the officer is to be believed, the location of the Defendants was pointed out in the courtroom. Bielecki said so himself. (JA V:1787, see also 1800 (Bell)). That alone is suggestive.

At least a dozen or more "lay" witnesses testified before the trial court dealt with this problem.  As in <u>Greene</u>, the identification procedure "is unnecessarily suggestive if a positive identification is likely to result from factors other than the witness's own recollection of the crime," factors such as a police officer pointing out defendants or fixating the gaze of government witnesses to the defendants while engaging in conversation meant to supplement their recollections. These actions far exceeds the scope of suggestiveness in <u>Rogers</u> and <u>Archibald</u>, where the court ruled that the trial court denied the defendants due process for denying him the ability to move away from his lawyer during an in-court identification episode. Because a dozen witnesses testified and left in the course of this arduous trial, the trial court could not employ the two-part procedure in <u>Rogers</u> to ascertain the admissibility of suspect identification information.

Hence, defendants argue that all lay eyewitness testimony prior to the events of October 30 are tainted. The plain error analysis in <u>Rogers</u> aptly describes this situation, where, "when examined in the context of the entire case, the error is so obvious and substantial that failure to notice and correct it would affect the

fairness, integrity or public reputation of judicial proceedings." The test for reversal at this point would be harmless error. "The outcome of a harmless error analysis is by necessity fact-specific. What may be harmless within the context of one set of facts may prove to be otherwise within the context of another." U.S. v. Mason, 993 F.2d 406, 409 (4th Circ 1993) See also U.S. v. Nyman, 649 F.2d 208, 212 (4th Cir. 1980) (whether error is harmless turns on "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.").

Appellants cannot deny that some evidence admitted at trial was separate and apart from lay testimony. Crack cocaine was found pursuant to a search warrant on February 20, 2012. One Appellant confessed to the crack that was thrown out the window. Several Appellants were seen in proximity to crack left at public locations.

However, this does not show the architecture nor the size of the conspiracy alleged in this case. The government relied on its lay witnesses for this. The sheer number of these witnesses is illustrative. Indeed, when the Court enquired at day six whether the evidence was beginning to become cumulative, counsel for the government stated that it had to prove the weight of crack alleged in light of the challenges made by defense counsel. (JA V:1689). The testimony of the dozen or more of actual "drug co-conspirators" decisively convinced the jury of the requisite

quantum of drugs necessary for conviction. Because of the exposure of the witnesses to the layout of the courtroom, the scope of the damage caused by evidence latent with impermissible suggestiveness spoils the perception of fairness and integrity in this judicial proceeding.

Hence, the motion for mistrial should have been granted. The Appellants all request remand.

## V.   THE TRIAL COURT PLAINLY ERRED AT SENTENCING IN APPLYING A THREE-LEVEL SENTENCING ENHANCEMENT UNDER U.S.S.G. § 3B1.1(b) AS TO APPELLANT NIKKI WILLIAMS FOR HER ALLEGED ROLE IN THE OFFENSE AS A MANAGER OR SUPERVISOR.

### A.    Standard of Review

The district court's factual findings regarding a sentencing enhancement are reviewed for clear error and the legal interpretations of the Guidelines de novo. United States v. Carter, 601 F. 3d 252, 254 (4th Cir. 2010). The district court's ruling regarding a role adjustment is a factual determination reviewed for clear error. United States v. Kellam, 568 F. 3d 125, 147-48 (4th Cir. 2009). Clear error occurs "when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Harvey, 532 F. 3d 326, 336 (4th Cir. 2008).

32

**B.     Discussion of the Issue**

Nikki Williams was not a manager or supervisor of criminal activity involving five or more participants.  The United States' argument is based on speculation and innuendo.  The evidence demonstrated that the co-conspirators traveled to the Winchester area and participated in illegal drug trafficking far before Ms. Williams was reported to be seen.  In fact, Ms. Williams was allegedly seen in the area only on limited occasions.  At trial, the government witness, David Shifflett, testified he only purchased small amounts of drugs from Ms. Williams on three or four occasions.  (JA IV:1402-3).  Jason Guadine was present at the residence of Mike Jones, and this residence was used as a distribution point for crack cocaine.  Mr. Guadine was present hundreds of times each month at the residence of Mr. Jones from the winter time of 2010 to March, 2011.  During this entire period, he never saw Nikki Williams sell or possess crack cocaine.  In fact, Jason Guadine only saw Ms. Williams at this residence on two occasions.  (JA IV:1295-6).

Being a girlfriend of Alfanco Britton doesn't make Nikki Williams a manager or supervisor.  Participating in any money transfers does not separate her from anyone else in the conspiracy.  The government's management "theory" is largely based on the testimony of Special Agent John Brian Padgett concerning money or wire transfers from the Winchester area to Florida.  However, in his

direct testimony, Agent Padgett candidly admitted there were no photos, recordings, or fingerprints linking any individuals in the alleged conspiracy to the fund transfers.  In fact, other than a similar name being used, no direct evidence was offered that the defendant Nikki Williams ever sent or received funds which had any connection whatsoever to the alleged conspiracy.  (JA V:1916-7).

A defendant acts as a "manager" of a criminal conspiracy if he or she "exercises some degree of control over others involved in the commission of the offense, or plays a significant role in the decision to recruit or to supervise lower-level participants."  Ellerby v. United States, 187 F.3d 257, 259 (2d Cir. 1998).  Merely playing an **essential** or **important** role in an offense does not by itself make a defendant a manager or supervisor.  There must be evidence of control over at least one other participant.  United States v. Slade, 631 F.3d 185 (4th Cir. 2011).  During the entire trial, Nikki Williams was rarely mentioned, and the United States is asserting because of that fact then she must be a manager.  Sycarra Chinn, an alleged co-conspirator, testified she did not know Nikki Williams and that she had no knowledge of her involvement in the conspiracy.  (JA V:1714).  During the testimony of government witness Kevin Kern, he misidentified Nikki Williams and he could not describe any illegal activity she was involved in.  (JA V:1675-6).

The United States alleges that Nikki Williams is the "manager" largely based on the speculation of several government witnesses and the fact that no

34

controlled buys were made from the defendant.  Therefore, she must have had some role other than hand to hand distribution on the street level.  Because she did not participate in illegal drug distributions, she must have been "running the operation".  It is certainly reasonable to assume Ms. Williams would have conversations with Alfanco Britton, her boyfriend, and Antonio Williams, her son. It is hard to imagine how Ms. Williams' opinions or management skills would have any influence or persuasion over the mastermind and enforcer of the operation, Alfanco Britton.  It is clear that Alfanco Britton and his associates arrived in the Western District of Virginia far before Ms. Williams arrived.

There is no evidence of any grand meeting in Florida with Ms. Williams concocting the scheme to send her boyfriend and son to the Commonwealth of Virginia to pursue an illegal enterprise.  Clearly, the co-conspirators went on their own and this was their venture.  Asserting an opinion or having an alternative role in the conspiracy does not make one a manager.  If the evidence was more extensive against Ms. Williams perhaps the United States would have a stronger argument.  In conclusion, the government's theory is based not only on the speculation of its own witnesses but also on its own theories and hypotheses.  The district court erred by applying a three-level enhancement for an alleged leadership role in the offense, and the judgment must be reversed.

For the foregoing reasons, Nikki Williams requests remand for resentencing in light of the error.

## CONCLUSION

For the foregoing reasons, the Appellants pray for the specific relief listed in each assignment of error.

## REQUEST FOR ORAL ARGUMENT

Appellants respectfully request Oral Argument in the matter.

This <u>12th</u> day of August, 2013.

Respectfully submitted,

<u>s/ W. Andrew Harding, Esq.</u>

WYNN ANDREW HARDING
W. Andrew Harding, PLC
57 South Main Street, Suite 603
Harrisonburg, VA 22801
(540) 432-6500

*Counsel for Alfanco Britton*

JOHN S. HART, JR.
Hart Law Offices, Suite A
84 West Water Street
Harrisonburg, VA 22801
(540) 574-0366

*Counsel for Nikki Williams*

AARON LEE COOK
Cook Attorneys, A Professional
Corporation
71 Court Square, Suite B
Harrisonburg, VA 22801
(540) 564-9699

*Counsel for Antonio Williams*

ROLAND SANTOS
Law Office of Roland Santos
52 E. Market Street
Harrisonburg, VA 22801
(540) 434-2211

*Counsel for Demario Coffie*

36

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 13-4257(L        **Caption:** US v. Alfanco Britton, et. al.

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

*[Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines; Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines; any Reply or Amicus Brief may not exceed 7,000 words or 650 lines; line count may be used only with monospaced type]*

☑    this brief contains _____8, 139_____ [*state the number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐    this brief uses a monospaced typeface and contains _____ [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

*[14-point font must be used with proportional typeface, such as Times New Roman or CG Times; 12-point font must be used with monospaced typeface, such as Courier or Courier New]*

☑    this brief has been prepared in a proportionally spaced typeface using MS Word 2010 [*state name and version of word processing program*] in Times New Roman, 14 point [*state font size and name of the type style*]; *or*

☐    this brief has been prepared in a monospaced typeface using _____ [*state name and version of word processing program*] with _____ [*state number of characters per inch and name of type style*].

(s) W. Andrew Harding _____

Attorney for Appellant Alfanco Britton _____

Dated: 08/12/2013 _____

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 12, 2013, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF System, which will

send notice of such filing to the following registered CM/ECF users:

Grayson A. Hoffman
Office of the U.S. Attorney
116 North Main Street
Harrisonburg VA 22802
(540) 432-6636

*/s/ Catherine B. Simpson*
Counsel Press LLC
1011 East Main Street
Suite LL-50
Richmond, Virginia 23219
(804) 648-3664

Filing and service were performed by direction of counsel